# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT

_____


DYLAN JOSEPH RIVERA,

Appellant,

v.

STATE OF FLORIDA,

Appellee.


No. 2D2023-2053

_____


November 8, 2024

Appeal from the Circuit Court for Hillsborough County; Robin F. Fuson, Judge.

Howard L. Dimmig, II, Public Defender, and Caroline Joan S. Picart, Assistant Public Defender, Bartow, for Appellant.

Ashley Moody, Attorney General, Tallahassee, and James A. Hellickson, Assistant Attorney General, Tampa, for Appellee.


BLACK, Judge.

Dylan Rivera appeals from his judgment and sentences for trafficking in fentanyl, possession of a controlled substance with intent to sell or deliver, and resisting an officer without violence. We reverse and remand with instructions to discharge Rivera.

I. Background

Rivera was charged in count 1 with trafficking in fentanyl (28 grams or more) based on his possession of a fentanyl derivative as identified in section 893.03(1)(a)62, Florida Statutes (2022), and in count 2 with possession with intent to sell or deliver methamphetamine.[1]  The methamphetamine was found in a closed, zippered bag on Rivera's person, and 28.4 grams of a fentanyl derivative were found in a black lockbox on Rivera's person.

Following the denial of motions to suppress and dismiss, Rivera entered a guilty plea to the charges against him.  He now appeals from his convictions and sentences, having reserved the right to challenge the dispositive order denying his motions.  *See* Fla. R. App. P. 9.140(b)(2)(A)(i).

The following facts were adduced at the hearing on Rivera's motions to suppress and dismiss.[2]  On August 18, 2022, law enforcement, with the assistance of a first-time confidential informant who had been arrested earlier that same day, set up a fentanyl buy with a person the CI referred to only as "Nephew."  Detective Burnham was asked how he became involved with the case, and he testified that he "was speaking with a confidential source who advised that he or she was able to order an amount of fentanyl from a suspect that they knew as Nephew."  Detective Burnham was then asked, "And to your knowledge

---

[1] The information provided that the methamphetamine for which Rivera was charged is as described in subsections 893.03(1)(c), (2)(c)1, (2)(c)2, (2)(c)3, (2)(c)6, (2)(c)7, (2)(c)8, (2)(c)9, (2)(c)10, (3), or (4), Florida Statutes (2022).

[2] The suppression hearing at issue in this case also covered a related case.  *See Rivera v. State*, 387 So. 3d 1190 (Fla. 2d DCA 2024) (table decision).  This appeal addresses only the case identified by the trial court in its order as the "Art's Lounge" case, and it preceded in time the related case, the "Cracker Barrel" case.

who is Nephew?" to which he responded, "Dylan Rivera." Detective Burnham did not testify as to how he knew Nephew to be Rivera. Detective Burnham otherwise testified that the CI arranged a buy with Nephew to occur at Art's Lounge and that Nephew said "about forty minutes."

Detective Sequeira testified that he became involved with the case when Detective Burnham held a briefing about an undercover narcotic operation. At the briefing, "a[n] image of Mr. Rivera was presented" and "the deal was said for 2 grams of fentanyl." Detective Sequeira did not explain why Rivera's image was shown or why it was believed that Rivera was Nephew.

Detective Sequeira was tasked with surveillance and apprehension of Rivera. After watching Rivera walk into Art's Lounge and sometime later walk out and toward law enforcement's covert vehicle, Detective Sequeira "instructed Corporal Dahl at the time hey, once he passes the rear of the covert vehicle we're going to exit out, announce ourselves, and detain him." Both men were wearing tactical vests with "Sheriff" on them when they exited the vehicle. Corporal Dahl announced himself and directed Rivera to stop. Detective Sequeira testified that Rivera ran and that both Corporal Dahl and Detective Sequeira yelled, "Sheriff's office, stop." Detective Sequeira then "saw [Rivera] drop a cell phone and then saw him, like, a bag drop out of his hand, small little baggie." Detective Sequeira said nothing more about the baggie.

When asked what the basis for detaining Rivera was, Detective Sequeira responded: "Based on the communication he was having with the undercover detective [sic] arranging a transaction. Responding to the location of where he agreed to deliver said substance. Arriving at the location." Detective Sequeira further testified that Rivera was under

3

arrest when officers caught him and that it was standard operating procedure to search Rivera's person after advising Rivera that he was under arrest.[3]  Rivera was searched, and the closed containers found on his person were removed.

Detective Stearns testified that "[a] narcotics transaction was arranged with the subject named Nephew, who later was identified as Dylan Rivera."  He provided no further details regarding the identification.  Detective Stearns was not on scene when the signal to arrest was given;[4] when he arrived at Art's Lounge, Rivera was already in custody.  Detective Stearns noted that Rivera was handcuffed, that a black lockbox was in his pocket, and that a lighter leash was around his waist.  Detective Stearns testified that based on Rivera being in custody he opened the lockbox and found a significant amount of a white substance later confirmed to be fentanyl.[5]

Detective Dillon testified next and explained that she became involved with the case during the briefing held after the CI made the phone call to Nephew.  During that briefing, Detective Dillon learned "that a source of supply was mentioned as Nephew, who was later identified as Dylan Rivera."  Again, no details regarding the identification

---

[3] When asked, "So you didn't observe him—you didn't actually observe him commit any criminal acts in front of that bar or outside, did you?" Detective Sequiera responded, "No."

[4] Witnesses testified inconsistently as to whether Rivera was to be arrested or detained upon his exit from Art's Lounge.  In the order on review, the court found, "After [Rivera] walked past the covert vehicle, Detective Sequiera gave the signal to arrest [Rivera]."

[5] Rivera was charged with trafficking of a fentanyl derivative. Whereas fentanyl derivatives are schedule I controlled substances identified in section 893.03(1)(a)62, fentanyl is a schedule II controlled substance identified in section 893.03(2)(b)9.

4

were provided.  Detective Dillon testified that she observed Rivera exit Art's Lounge and that after the "move in" signal was given, she observed Detective Sequeira and Corporal Dahl attempt to arrest Rivera, following which a brief foot chase occurred.  She did not testify that she observed Rivera drop a baggie; rather, she testified that following Rivera's arrest, she observed "a white bag" about five feet away from Rivera which "eventually" was given to Detective Sequeira.  She testified that she was given a small bag that Detective Stearns advised had been clipped to Rivera's pants and that she opened and searched that bag.  Detective Dillon further testified that she did not see Rivera with anything that was "clearly narcotics or could even be construed as [narcotics]" and that she did not see Rivera commit any criminal acts until he was arrested.

Other undisputed facts adduced at the hearing include that the CI was not present at Art's Lounge, that Rivera did not arrive on scene until hours after the phone call arranging the buy, and that Rivera remained inside Art's Lounge for an extended period after his arrival.  The CI did not testify at the hearing.

Rivera sought to suppress evidence "found as a result of the illegal search of [his] person."  Rivera specifically identified a locked black lockbox (left pant pocket); a black nylon bag (right pant pocket); keys attached to a lighter leash and a closed blue bag (on belt loop); and any statements or admissions alleged to have been made by Rivera.  Rivera contended that law enforcement's search of the closed containers found on his person violated his Fourth Amendment rights and *Arizona v. Gant,* 556 U.S. 332 (2009), where the searches were not necessary for officer safety or to prevent destruction of evidence.  Rivera also sought suppression of the baggie found on the ground and a plastic bag found in his pocket.  He alleged that the CI involved in his arrest called someone

5

known as "Nephew," that the CI was not present at Art's Lounge, and that Rivera was never identified as "Nephew." Rivera alleged that law enforcement had no particular and objective basis to suspect him of criminal activity and that there is no legal basis for the resisting without violence charge as officers were not lawfully executing a duty when they ordered him to stop and he ran. These same assertions are the basis for Rivera's motion to dismiss the resisting charge.

The court orally denied Rivera's motions. The court stated it would include case law in its written order but determined that it is standard operating procedure "that they don't bring anything in the car back to the station unless it's searched." When counsel for Rivera pointed out that a locked box is not inherently a weapon, the court stated: "You don't know what's in it. It could be nitroglycerin. It could be Semtex. It could be a large amount of fentanyl . . . . You got to know what's in it."

In the written order denying suppression and dismissal, the court addressed the Art's Lounge and Cracker Barrel cases together. The court did not differentiate between what was known to officers when they encountered Rivera at Art's Lounge and what they knew months later at Cracker Barrel. And while the court found that officers were shown a photograph of Rivera at the briefing and that it was Rivera at Art's Lounge, it did not address how law enforcement determined that Rivera was the person the CI had called, who was only identified as Nephew and for whom no physical description was provided. Citing *Gant*, the Hillsborough County Sheriff's Office standard operating procedures, and section 901.21, Florida Statutes, the court found that the officers could legally seize the containers found in the search of Rivera's person. The court then found it was reasonable for officers to assume that drugs were in the containers and therefore reasonable to search them.

6

II.  Standard of review

"When reviewing a motion to suppress, the standard of review for the trial court's application of the law to its factual findings is de novo, but a reviewing court must defer to the factual findings of the trial court that are supported by competent, substantial evidence." *State v. Zachery*, 255 So. 3d 957, 960 (Fla. 2d DCA 2018) (quoting *Duke v. State*, 82 So. 3d 1155, 1157-58 (Fla. 2d DCA 2012)).  A defendant seeking to suppress an illegal search must " 'make an initial showing that the search was invalid.'  However, '[a] warrantless search constitutes a prima facie showing which shifts to the [S]tate the burden of showing the search's legality.' "  *State v. K.C.*, 207 So. 3d 951, 953 (Fla. 4th DCA 2016) (alterations in original) (first quoting *Miles v. State*, 953 So. 2d 778, 779 (Fla. 4th DCA 2007); and then quoting *Lewis v. State*, 979 So. 2d 1197, 1200 (Fla. 4th DCA 2008)).  In this case, the search was warrantless, and the State bore the burden at the hearing.

III.  Dismissal

With regard to the motion to dismiss, Rivera contends that officers lacked reasonable suspicion to detain him and were not acting in lawful execution of their duties such that he was not resisting without violence when he ran from officers.  We agree.

"To be guilty of unlawfully resisting an officer, an individual who flees must know of the officer's intent to detain him, *and* the officer must be justified in making the stop at the point when the command to stop is issued." *Lachman v. State*, 309 So. 3d 244, 245 (Fla. 2d DCA 2020) (emphasis added) (quoting *C.E.L. v. State*, 24 So. 3d 1181, 1186 (Fla. 2009)).  An officer is justified in making the stop if there is "reasonable

7

and well-founded suspicion that criminal activity has occurred or is about to occur." *C.E.L.*, 24 So. 3d at 1186.[6]

At the hearing, Rivera argued that the State presented no testimony or other evidence identifying Rivera as the person whom the CI called to set up a buy. He argued that there was no evidence establishing how law enforcement knew that the person on the phone with the CI was Rivera or that Rivera was "Nephew." Further, he argued that the CI was an unreliable source who did not testify and who "ha[d] every reason to tell law enforcement anything to try to help her situation," having been arrested herself earlier the same day.

"It is the State's burden to establish that police had the necessary reasonable suspicion to detain and the necessary probable cause to arrest an individual." *K.W. v. State*, 328 So. 3d 1022, 1025 (Fla. 2d DCA 2021); *accord Brown v. State*, 313 So. 3d 848, 850 (Fla. 2d DCA 2021). "Reasonable suspicion of criminal activity may arise from tips that law enforcement receives, but whether tips can provide reasonable suspicion depends upon both the quantity and quality of the information, or its degree of reliability." *Regalado v. State*, 25 So. 3d 600, 603 (Fla. 4th DCA 2009); *accord Slydell v. State*, 240 So. 3d 134, 135-36 (Fla. 2d DCA 2018). Where the CI is untested, providing "detailed and verifiable information on the occasion in question" can establish reliability. *See Everette v. State*, 736 So. 2d 726, 727 (Fla. 2d DCA 1999).

---

[6] During the hearing, law enforcement officers focused on the point at which Rivera exited Art's Lounge and testified inconsistently as to whether Rivera was under arrest or detained at that point. We do not determine which standard applied; we address only whether law enforcement had reasonable suspicion to detain Rivera because " '[r]easonable suspicion' is a less demanding standard than that for probable cause." *See Cruz v. State*, 320 So. 3d 695, 713 (Fla. 2021) (quoting *State v. Gonzalez*, 682 So. 2d 1168, 1170 (Fla. 3d DCA 1996)).

In *State v. Flores*, 932 So. 2d 341 (Fla. 2d DCA 2006), this court addressed facts both similar and dissimilar to this case in determining that the trial court erred in granting the motion to suppress:

> The charges against Flores arose out of a controlled buy in which a confidential informant ("CI") that the police had never used before arranged to purchase crack cocaine from one of his suppliers. The CI had been arrested earlier in the day for possession of cocaine and possession of drug paraphernalia. An officer was present when the CI arranged the meeting by telephone, and the CI provided the officers with the following information: The CI was to meet a man named Chico in fifteen minutes at a particular 7–Eleven to purchase $50 worth of crack cocaine; Chico, a Hispanic male in his midtwenties, would be driving a dark-colored Nissan; Chico would arrive at the west side of the convenience store; and Chico would be alone. A car matching the description given by the CI arrived at the arranged place at the arranged time; however, there were two people in the car. Officers approached the car with guns drawn and opened the car door. As the driver exited the vehicle, officers observed him drop cocaine from his hand. The officers arrested the driver for possession of cocaine and determined that the driver was Flores.

*Id.* at 342.

At issue in *Flores* was "whether the tip [from the CI] provided the reasonable suspicion needed" for an investigatory stop. *Id.* at 343. In determining that the tip was sufficient, this court cited the following facts:

> The CI had purchased drugs from Flores previously, thus establishing the basis of his knowledge. The officer listened as the CI made arrangements to purchase $50 of cocaine from someone on the telephone. The CI provided information as to where and when the purchase would take place and what type of vehicle the supplier would be driving. The officers reported to the location given by the CI, and a vehicle matching the description given by the CI timely arrived.

*Id.* at 344. The CI also provided a description, albeit vague, of Flores.

9

The *Flores* opinion distinguishes an earlier decision of this court, *Miller v. State*, 780 So. 2d 151, 152 (Fla. 2d DCA 2000). *Miller* concluded that the trial court erred in denying the motion to suppress where the information provided by a new and untested CI was not sufficiently reliable to provide officers with the reasonable suspicion needed for an investigatory stop. In *Miller*, the CI

> used a pay phone to call a pager number that he said belonged to his supplier. The call was returned, and the C.I. stated to the officers that a man named Rolo would arrive at an agreed location to sell him drugs in about fifteen minutes. Neither the pager number nor the call-back number was obtained by the officers. The C.I. told the officers where Rolo lived, that he would be driving a maroon Buick with a tan top, and there would be drugs under the seat on the driver's side of the car.

780 So. 2d at 151.

The evidence provided at the suppression hearing in the instant case is negligible compared to that provided in both *Miller* and *Flores*. We have an untested, new CI. The detective listening to the call testified that the CI knew the person she was calling as Nephew and that "she was able to order an amount of fentanyl" from Nephew. No description of Nephew was provided. No testimony was provided as to how or why law enforcement believed Nephew was Rivera; for example, no existing law enforcement knowledge from an ongoing or prior investigation was provided. No description of Rivera's vehicle or other details were provided. A buy was set up at a public location, and although Nephew said "about forty minutes," Rivera did not appear at Art's Lounge until three hours later. The only evidence connecting Rivera to the buy was his presence at Art's Lounge. *Cf. State v. Clark*, 986 So. 2d 625, 630 (Fla. 2d DCA 2008) (reversing order granting suppression where the CI "provided a detailed description of Mr. Clark, including his race, age,

10

height, build, nickname, and the type of vehicle that he drove" and upon arrival at the buy location officers were able to corroborate that information along with the prearranged signal Mr. Clark would give). Under the totality of the circumstances, law enforcement did not have reasonable suspicion to detain Rivera at the time they exited the covert vehicle, announced themselves, and ordered Rivera to stop. *See State v. Hendrex*, 865 So. 2d 531, 534 (Fla. 2d DCA 2003) ("Under the Fourth Amendment, an arrest . . . requires a higher level of justification than that required for an investigatory stop.").

Accordingly, Rivera's motion to dismiss should have been granted and his conviction for resisting without violence must be reversed.

IV. Suppression

As to the denial of suppression, dispositive of the trafficking and possession convictions, Rivera argues that the searches of the closed containers removed from his person were warrantless, not valid as searches incident to arrest, and not subject to any other delineated exception to the warrant requirement such that the trial court should have granted suppression. Again, we agree.[7]

As discussed above, the evidence failed to establish that officers had reasonable suspicion to detain Rivera—much less probable cause to arrest him—when Rivera arrived on scene at Art's Lounge. And although the trial court found that the baggie Rivera dropped in the brief foot

---

[7] Our review is limited to considering whether the trial court correctly denied suppression and dismissal where the order was dispositive of the charges filed against Rivera, to which he pleaded and upon which judgment was rendered. We are not tasked with determining whether the State could have charged Rivera with possession based on the dropped baggie. *See Kutzorik v. State*, 891 So. 2d 645, 646 n.1 (Fla. 2d DCA 2005); *Beauchamp v. State*, 742 So. 2d 431, 432 n.4 (Fla. 2d DCA 1999).

chase provided probable cause for his arrest, that finding is unsupported by the evidence presented at the suppression hearing.[8]  *Cf. Mosley v. State*, 739 So. 2d 672, 675 (Fla. 4th DCA 1999) ("In the case before us, the officers' original pursuit of the defendant lacked both reasonable suspicion and probable cause. . . .  However, the evidence placed before the jury included testimony that during the initial invalid pursuit, the defendant dropped his cocaine pipe and it was found by Officer Bradford . . . .  Lt. Wagner recognized it as a cocaine pipe as soon as the defendant pulled it from his pocket.  Officer Bradford immediately recognized the pipe as illegal contraband when he picked it up off the ground.  *At that point*, the officers had probable cause to arrest the defendant." (emphasis added)); *Welch v. State*, 689 So. 2d 1240, 1241 (Fla. 2d DCA 1997) (reversing judgment and sentence on the basis of improper denial of motion to suppress where "neither the mere sight of a baggie, nor the concealment thereof, established a well-founded suspicion to seize or detain [the defendant]" and "[t]he fact that one of the officers equivocally stated he saw something in the baggie, without more, does not change the situation").  The arrest was unlawful, and therefore the evidence discovered in the searches incident to Rivera's arrest must

---

[8] We make no comment as to whether officers could have legally detained Rivera upon his dropping of the baggie; officers did not detain Rivera following the chase—they arrested him.  *Cf. Conyers v. State*, 164 So. 3d 73, 77 (Fla. 2d DCA 2015) ("The issue is not whether the officer could arrest Mr. Conyers for possession of paraphernalia when he first felt the object but whether the Fourth Amendment permitted the officer to conduct a limited search, a removal of the object from Mr. Conyers' pocket.  Once the object was removed, the officer's visual inspection either would confirm that the object was a crack pipe and establish probable cause to arrest or it would disclose that the item was some uncommon innocent item not justifying his further detention.").

12

be suppressed. *See, e.g., Fournier v. State,* 731 So. 2d 75, 77 (Fla. 2d DCA 1999).

However, even had Rivera's arrest been lawful—as the trial court ruled in this case—suppression would nonetheless be required. "[T]he search of an item from which a defendant has been physically separated cannot be upheld as a search incident to the defendant's arrest." *See Ancrum v. State,* 146 So. 3d 1217, 1220 (Fla. 2d DCA 2014). That is, "a search incident to arrest only includes the arrestee's person and the area within his immediate control, i.e., the area into which he may reach to acquire a weapon or destroy evidence." *Smallwood v. State,* 113 So. 3d 724, 734 (Fla. 2013); *accord Jean v. State,* 369 So. 3d 1235, 1239 (Fla. 6th DCA 2023).

In *Smallwood,* the Florida Supreme Court held that once Smallwood's cellphone "was removed from Smallwood's person, there was no possibility that Smallwood could use the device as a weapon, nor could he have destroyed any evidence that may have existed on the phone. Accordingly, neither the officer protection nor the evidence preservation justification for the warrant exception applied." 113 So. 3d at 735. "Thus, where an arrestee has been secured by police officers and separated from the thing that the officers wish to search, neither of the rationales for the search incident to arrest exception apply and, accordingly, a search of that thing cannot be conducted as a search incident to arrest." *Jean,* 369 So. 3d at 1239 (first citing *Smallwood,* 113 So. 3d at 735; and then citing *Gant,* 556 U.S. at 335). *Gant* likewise provides, "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." 556 U.S. at 339.

13

The evidence presented at the suppression hearing establishes that Rivera was under arrest and had been handcuffed when his person was searched and the lockbox and bag were removed from his person. The evidence further establishes that the lockbox and bag were given to officers on scene to search; they were no longer in Rivera's control or reach.

At the hearing, the prosecutor referenced section 901.21, Florida Statutes (2022), in connection with the standard operating procedures testified to by the detectives. Section 901.21 is divided into subsections; subsection (1) provides for "*search* [of] the person arrested and the area within the person's immediate presence," and subsection (2) provides for "*seize[ure]* [of] all instruments, articles, or things discovered on the person arrested or within the person's immediate control." (Emphasis added.) Thus had Rivera's arrest been lawful, the lockbox and the bag would have been legally seized by the police. But seizure is not the same as search. *See, e.g.*, *Hanifan v. State*, 177 So. 3d 277, 282 (Fla. 2d DCA 2015) (Villanti, C.J., concurring) (" '[D]ifferent interests are implicated by a seizure than by a search' because of the less intrusive nature of a seizure." (quoting *Segura v. United States*, 468 U.S. 796, 806 (1984))).[9]

_____

[9] We briefly address the State's assertion that regardless of a Fourth Amendment violation, the evidence in this case should not be excluded because law enforcement did not act "deliberately, recklessly, or with gross negligence" and there is otherwise no "recurring or systemic negligence on the part of law enforcement." *See Davis v. United States*, 564 U.S. 229, 240 (2011). Evidence established that the standard operating procedure employed by law enforcement—at least insofar as the officers involved understood it—conflicts with binding judicial precedent of the last decade regarding the search of items from which a defendant has been physically separated not involving a vehicle. And the State, bearing the burden of proof, offered no evidence whatsoever that law enforcement's actions were not deliberate, reckless, grossly negligent or otherwise recurring or systematic negligence. *See State v. J.R.D.*, 311

Relying on its understanding of *Gant*, the trial court determined that the officers' *search* of the lockbox and bag was lawful because evidence of the drug offenses for which Rivera was arrested might be contained therein. The trial court found that the search in this case was lawful because, under its reading of *Gant*, "it was reasonable for law enforcement to believe that the containers found on [Rivera] would hold evidence of the offense of arrest, possession of narcotics." Further, citing *Smallwood*, the court determined that "*Gant* has been found to apply to all searches, and not just automobile searches as discussed in *Gant*."

The trial court misconstrued both *Gant* and *Smallwood*. *Gant* unambiguously "conclude[s] that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" 556 U.S. at 343 (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring)). And in *Smallwood* the Florida Supreme Court recognized the limited application of the "evidence relevant to the crime of arrest" justification, finding that it was not at issue in *Smallwood* because Smallwood was not in a vehicle at the time that he was arrested. 113 So. 3d at 735 n.6 (quoting *Gant*, 556 U.S. at 343). This limited application has been recognized by other district courts of appeal. *See, e.g., Jean*, 369 So. 3d at 1241 (concluding that the " 'evidence relevant to the crime of arrest' exception . . . applies only to vehicles and any containers therein" and that therefore, "[b]ecause the

---

So. 3d 84, 89 (Fla. 2d DCA 2019) ("[I]t was the State's burden to prove that such errors were <u>not</u> routine or widespread, and it failed to do so."). Similarly, the State failed to present any evidence regarding inventory procedures or inevitable discovery. *See Jean*, 369 So. 3d at 1242; *cf. Ross v. State*, 319 So. 3d 807, 812 (Fla. 2d DCA 2021) (reiterating that it is the State's burden to present evidence with regard to inventory search).

15

fanny pack was never stored on or in a vehicle, the officers were not permitted to search the fanny pack pursuant to the 'evidence relevant to the crime of arrest' exception established in *Gant*"); *Harris v. State*, 238 So. 3d 396, 403 (Fla. 3d DCA 2018) (concluding that the search of appellant's backpack "was not a valid search under *Gant*'s automobile exception" where "[a]ssuming a dirt bike qualifies as a vehicle for purposes of this exception, the facts are clear that [appellant's] backpack was not a part of the dirt bike nor stored on or in it").[10] Here, Rivera was not in a vehicle at the time he was arrested, nor was the evidence sought to be suppressed found in his vehicle. The exception articulated in *Gant*—"justify[ing] a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle"—is not applicable here. *See Gant*, 556 U.S. at 335. And the law that is applicable in this case makes it clear that the trial court erred in denying suppression.

V. Conclusion

For the foregoing reasons, the trial court erred in denying Rivera's motions. The order on review is dispositive of the charges to which Rivera pleaded. Accordingly, his judgment and sentences for trafficking in fentanyl, possession of a controlled substance with intent to sell or deliver, and resisting an officer without violence are reversed, and we remand for Rivera's discharge in this case.

---

[10] Further, to the extent the trial court's reasoning was premised on a continuing concern about safety, it was not objectively reasonable to believe a search of the items removed from Rivera's person was necessary on the facts of this case. *Cf. S.P. v. State*, 331 So. 3d 883, 892-93 (Fla. 2d DCA 2022). That is, the State presented no evidence suggesting that Rivera was in possession of explosives or that placing containers holding even large amounts of fentanyl in the trunk of a law enforcement vehicle would be unsafe.

Reversed and remanded with instructions.

CASANUEVA and SILBERMAN, JJ., Concur.

_____

Opinion subject to revision prior to official publication.